**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| CANDI WALZ, TIMOTHY WALZ, and TANNER WALZ, | |
| Plaintiffs, | No. 18-CV-67-KEM |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| BRIAN RANDALL; JOSEPH QUANDT; DENNIS KUCERA; and TAMA COUNTY, IOWA; | |
| Defendants. | |

_____

Tanner Walz and his parents, Candi and Timothy Walz, (collectively, the Walzes) brought claims under 42 U.S.C. § 1983 and state law after Tanner,[1] then a minor, was arrested and charged with three counts of sexual abuse in the third degree under Iowa law. The state prosecutor ultimately dismissed the charges (after the court granted Tanner's suppression motion). The Walzes primarily argue that the Tama County, Iowa, sheriff's deputies that conducted the investigation of Tanner ignored exculpatory evidence and failed to conduct a thorough investigation before arresting Tanner. The Defendants, Tama County and Tama County Sheriff's Deputies Brian Randall, Joseph Quandt, and Dennis Kucera, now move for summary judgment based on qualified immunity. Doc. 37. The Walzes resist. Doc. 46. I **grant** the motion for summary judgment (Doc. 37).


## I.   BACKGROUND

The facts in this section are recited in the light most favorable to the Walzes, the nonmoving parties. On Monday, September 26, 2016, at around 7:50 p.m., on-duty

---

[1] I refer to the Walzes by their first names to avoid confusion.

Sheriff's Deputies Randall and Quandt had just finished their dinner break at a restaurant when a woman named Angela stopped them in the parking lot and said that her sixteen-year-old daughter H.P.[2] had been raped by Tanner the previous Saturday night. Def. SOF ¶¶ 5, 7-8; Pl. Resp. SOF ¶¶ 5, 7-8; Pl. SOF ¶¶ 16, 31-38; Def. Resp. SOF ¶¶ 31-38; Def. App. 29, 227.[3] Angela said that she and her husband had not been home and that H.P. had invited three boys over to the house, including Tanner (Angela also named the other two boys). *Id.* The deputies asked H.P., who was with her mother, where the incident took place, and she said on her bed in her bedroom. *Id.* The deputies advised Angela to take H.P. to the hospital for an examination, but first, they requested to accompany Angela and H.P. to the house to gather the clothes H.P. had been wearing Saturday night. *Id.* The deputies followed Angela and H.P. to their residence and obtained the clothes H.P. had been wearing, as well as bedding and a towel that had been on the bed during the alleged rape, none of which had been washed yet. *Id.* They instructed Angela to take H.P. to the hospital and not to ask her any questions about the incident, informing her that they would set up an interview with H.P. through the Child Protection Center. *Id.* A deputy later went to the hospital to pick up the rape kit from H.P.'s examination (which was never tested, since whether a rape occurred ultimately turned on the issue of consent). *Id.*

The next evening, Deputies Randall and Quandt talked with Angela at the sheriff's office. Def. SOF ¶ 9; Pl. Resp. SOF ¶ 9; Def. App. 30-31, 227-28; Def. Ex. D (video recording of interview). Angela explained how she had found out about the rape on

---

[2] I refer to Angela solely by her first name and to the alleged victim by her initials to protect the victim's identity.

[3] "Def. SOF" refers to the Defendants' Statement of Facts filed at Doc. 37-1; "Pl. Resp. SOF" refers to Plaintiffs' Response to Defendants' Statement of Facts filed at Doc. 46; "Pl. SOF" refers to Plaintiffs' Statement of Facts filed at Doc. 46-1; and "Def. Resp. SOF" refers to Defendants' Response to Plaintiffs' Statement of Facts filed at Doc. 54. "Def. App." refers to Defendants' Appendix filed at Doc. 42. "Pl. App." refers to Plaintiffs' Appendix filed at Doc. 50.

Monday: She saw a message on H.P.'s phone from Tanner's girlfriend asking if there was any truth to the rumor that H.P. had slept with Tanner on Saturday night.[4] Angela asked H.P. whether the rumor was true, and H.P. said yes. H.P. told her mother that Tanner had called her from another boy's Facebook account on Saturday, asking to come over, and when H.P. responded she was not allowed to have guests over without her parents being home, Tanner told her it would be fine. During this conversation, Angela and H.P. were in the car, driving through town, and Angela drove past a restaurant, where she saw a marked squad car. Angela wanted to talk to her husband about what happened, so she stopped at a gas station. Her husband talked to H.P. briefly about what happened while Angela went inside and purchased a soda, and Angela and H.P. got back in the car. Thinking that H.P. had consented to sex with Tanner, Angela asked H.P. whether they had used protection. H.P. said no. Driving at the time, Angela slammed on her brakes and asked, "Are you flipping kidding me?" H.P. stated, "I asked him if he had anything, he told me no, and I said, then we're not doing anything, and he did it anyway." At that point, Angela believed that H.P. had been raped and was furious about it, and she went to the restaurant to talk to the officers.

Later in the interview, Angela relayed additional details that she had learned from H.P. She stated that the two other boys at the house had been in a different room during the rape. Angela said she had not gotten the whole story from H.P., noting that the two other boys might have been in the "wrong place" at the "wrong time," but "by that same token, they were in on the conversation and they knew what was going on and they did nothing."

Angela also told the deputies what she knew about Tanner and H.P.'s relationship. Tanner and H.P. had been in the same math class the previous year, and H.P. had tried to befriend Tanner, a troublemaker in class. Angela also said that Tanner had been to

<hr />

[4] The facts related to Angela's interview are taken from the video recording of the interview. *See* Def. Ex. D.

their house on one prior occasion, at the end of the previous school year for a bonfire. Angela stated Tanner had shoved another boy (who once dated H.P.), and Angela's husband had told H.P. that Tanner was banned from coming over again in the future. Angela also indicated that when Tanner came over on Saturday night, H.P. thought Tanner and his girlfriend were no longer together.

Angela told the deputies that she had gone to the school earlier in the day and learned that H.P. had talked to some school employees about what happened. Angela indicated that H.P. was very close with her resource-room teacher and had talked to her about having sex with Tanner at school on Monday, portraying the encounter as consensual. Angela also said that H.P. had talked to the two school guidance counselors. According to Angela, the guidance counselors said that H.P. described what had happened as a hypothetical and asked for their advice, and she later described what had happened as if she had dreamt it (which the deputies noted was a common coping device for sexual assault). It is unclear from Angela's interview whether H.P. portrayed the incident as consensual or not to her guidance counselors, but the deputies indicated in their depositions that if H.P. had told her teachers she was raped, they would have had a duty to report it. Angela also indicated that H.P. had talked about what happened with a friend via text message that day (Tuesday) after her friend asked why she was not in school.

Angela expressed concerns about H.P. having to see Tanner, the two other boys, and Tanner's girlfriend at school. Deputies Randall and Quandt indicated that a no-contact order between H.P. and Tanner would automatically be put into place once they filed charges but that H.P. did not have a good chance of success at obtaining a no-contact order before then. At the conclusion of the interview, the deputies indicated they would schedule H.P.'s interview with Child Protection Services the next morning, and they instructed Angela to make sure H.P. brought her phone to the interview so they could take pictures of the messages from Tanner's girlfriend. Angela asked whether they would need to seize H.P.'s phone, and the deputies indicated there was no need, since Angela

knew about the relevant evidence on H.P.'s phone due to her close relationship with her daughter.

Deputies Randall and Quandt did not investigate the matter further until the Child Protection Services interview with H.P. that took place on Friday, September 30, 2016. *See* Def. SOF ¶¶ 10-12; Pl. Resp. SOF ¶¶ 10-12; Def. App. 38-96. At the interview, Deputies Randall and Quant took pictures of the Facebook message that Tanner's girlfriend had sent to H.P. on Monday about the "rumors that [H.P.] and Tanner had sex Saturday night." Pl. SOF ¶ 46; Def. Resp. ¶ 46; Pl. App. 7.[5] Deputies Randall and Quandt also received the statement H.P. made at the hospital during her examination on Monday night:

> We were kissing. We were laying down. I don't remember how it started but he took his shirt off and I told him I don't want to do anything and he said why not. I said because of the risks. I asked him if he even had a condom and he said no. He said I didn't have to worry about anything because he'd been with his girlfriend for a year and a half and they'd done it a few times and she'd never gotten pregnant and they didn't use a condom. Then he took his pants off and his underwear and I kept telling him I didn't want to do anything and he said it was just one time and I didn't have to worry. He kept repeating that. He started kissing me again and laid me down and took my pants off. I kept tell him to stop and he never took my shirt off but he pulled my tank top up and he kissed me up and down like from my chest to where my underwear line would be. And then he did what he did. He laid on top of me and had sex with me and I just kept trying to push him off and I kept telling him no. He took his clothes to the bathroom and got dressed. Then he went to the living room with two other boys. . . . After he had sex with me he forced me to put his penis in my mouth too.

---

[5] Defendants objected to this fact on the basis that Plaintiffs' Appendix fails to include additional messages sent by Tanner's girlfriend. Defendants provided an omitted portion of the text message referenced above (Doc. 54 ¶¶ 45-46), but Defendants did not provide the court with evidence of additional messages.

Pl. SOF ¶ 44; Def. Resp. SOF ¶ 44; Def. App. 232. The records from the hospital also reflect that H.P. told the nurse that she had never had sex before the date of the assault. Def. App. 235.

H.P. made similar statements during the Child Protection Services interview. *See* Def. App. 46-96. H.P. said that Tanner messaged her on Facebook on Saturday from another boy's account, asking if he could come over.[6] Tanner showed up with two other boys, and they all went downstairs to watch television. H.P. asked Tanner about his girlfriend, and he said they had broken up. About five to ten minutes later, Tanner left the room. H.P. went to look for him and found him in the laundry room. H.P. gave Tanner a tour of the basement, and they ended up in H.P.'s bedroom. H.P. said that the other two boys were still watching television, and she slightly shut the door to her room out of habit. H.P. and Tanner talked about their math class the previous school year, and H.P. said that Tanner put his arms around her waist, almost as if they were slow dancing, and kept calling her pretty. H.P. said that Tanner pulled her onto the bed and tried to get her to lie down beside him. She said that "he had [her] arm," and her "other arm that [she] was holding [herself] up [with] kind of slipped, so [she] went down," and she stayed lying down. Def. App. 64. H.P. explained that then:

> [H]e just started kissing me. And like I don't really know how it happened. It just ended up happening. And I kept telling him to stop. And he's like, It's okay. It's okay. I'm like, No, stop. He's like, Well, I won't do anything. I'm like, Don't. And he's like, Well, what if I was somebody else? I was like, I still don't want to do anything. And he's like, Why? Are you scared of getting pregnant? I said, Well, yeah. And he's like, Trust me, I was with [my girlfriend] for a year and a half and we never used anything. And she's . . . never been pregnant. I was like, I don't care. I don't want to do anything. And I kept telling him no, and he wouldn't stop.

---

[6] The facts related to H.P.'s interview are taken from the transcript of the interview. *See* Def. App. 46-96.

Def. App. 66. H.P. told Tanner that even if she wanted to do something with him, she would not have sex with him without a condom, which he did not have. Def. App. 85. She talked about how Tanner kept pulling her shirt up to expose her stomach and bra and how she would pull it back down, and how she bent her knees to make it difficult for him to pull her pants off. Def. App. 67-70. H.P. said Tanner put his fingers in her vagina once he had taken both of their pants off. Def. App. 87-88. H.P. said that Tanner put her legs on his shoulders, and she "tr[ied] to force [her] legs back down" and told him she did not "want to do anything," but he "kept . . . trying to force [her] leg," and eventually, she got tired of trying to put her leg down. Def. App. 72-73. H.P. said that when Tanner tried to put his penis in her vagina, she "put [her] hand on his stomach and . . . kept trying to push him away" (but he was eventually successful). Def. App. 73. Tanner said it would be okay, and H.P. responded she did not "want to do anything." Def. App. 73. H.P. described the encounter as her "repeat[ing] [her]self so many times." *Id*. H.P. said that eventually, she moved Tanner's hands from her waist—adding that he let her move them easily—by interlocking their hands, and she was able to sit up (which she said she did to prevent anything else from happening). Def. App. 82. She said Tanner told her to lie back down, and then put his hands "behind [her] head, . . . put [her] face down[,] and . . . had his penis in [her] mouth." Def. App. 75-76. H.P. said when she finally realized what "he was trying to do, like when [she] went to move [her] hands to push him away, he had already had [her] head like where [she] couldn't do anything." Def. App. 84. H.P. said she pushed Tanner away and told him to go to the bathroom to put his clothes on. Def. App. 76. H.P. got dressed in her bedroom, and she exited her room at the same time that Tanner was leaving the bathroom. *Id*. They went into the living room together, where the other two boys were sleeping.[7] Def. App. 77. Tanner woke the boys up, and all three left.

---

[7] Plaintiffs suggest that H.P. said that she went into the living room without Tanner. They do not cite to any portion of the transcript of H.P.'s interview to support this fact, and that does not appear to be what H.P. said. They also suggest that H.P. said she did not know where one of

H.P. told the Child Protection Services interviewer that the next morning (Sunday), she had gone to work and had talked with a friend at work (who she named) about what happened. Def. App. 79. Her friend advised her to tell her mother. Def. App. 79-80. H.P. posited that someone overheard her talking to her friend at work, which is how the rumor about her and Tanner spread around school.

H.P. said that at school on Monday, she talked to the resource-room teacher and both guidance counselors. She said that they "agreed with [her] that if it happened to their kid, they would want [their kid] to tell them." Def. App. 80. H.P. said that she did not go into detail about what happened—although she did tell them she had not wanted Tanner to come over—and she did not "think anybody really knew what [she] was getting at, that it wasn't something that [she] wanted to do"; she said "they all thought that it was something that [she and Tanner] did because [they] wanted to." Def. App. 81-82. H.P. also indicated that she had learned from people at school that Tanner had been at a bonfire before coming over to her house on Saturday night and that he had been asked to leave because he was drinking beer and smoking cigarettes.

After H.P.'s interview, Deputies Randall and Quandt both agreed they found H.P. believable and credible because her statement was detailed and "virtually the same" as the statement she made at the hospital on Monday night. Def. SOF ¶ 12; Pl. Resp. SOF ¶ 12. They believed they had probable cause to arrest Tanner. *Id.* The deputies made arrangements to pull Tanner from school and interview him with his parents present. Def. SOF ¶ 13; Pl. Resp. SOF ¶ 13. At first, Tanner repeatedly denied having been to H.P.'s house on Saturday night or early Sunday morning. *See* Def. App. 105-154. He stated that he had been at his girlfriend's apartment around 10:00 p.m. and gone to a bonfire at his friend's house, and that after the bonfire, he went to a gas station and back

---

the boys was. Reading the statement Plaintiffs cite in context, it is clear H.P. said that the boy was sleeping in the living room, but she did not remember exactly where in the living room he was sleeping—she "want[ed] to say he was on the floor." Def. App. 77.

to his girlfriend's apartment. He denied being at H.P.'s house, even when the deputies suggested they could talk to his friends to confirm whether he had been there and when the deputies stated they could test H.P.'s bedding for his DNA. After Tanner wrote out a statement with his story, the deputies asked him to swear under penalty of perjury that he was telling the truth, reminding him that it was a crime to provide false information to a police officer. At that point, Tanner admitted that he had been to H.P.'s house, saying "I did go over to her house, but she wanted it. She convinced me. She forced me pretty much." Def. App. 154.

Tanner said that he and two other boys (the same boys H.P. had named) went back to his girlfriend's apartment after the bonfire. Tanner said that H.P. called one of the boys, knowing Tanner was with him, and asked the group to come over. Tanner said he talked to H.P. on his friend's phone. H.P. convinced them to come over, and they watched television in the basement for thirty to forty-five minutes. After the other two boys had fallen asleep, H.P. told Tanner to go to her room. Tanner said once in H.P.'s room, "[H.P.] turned on music, and she said, Want to have sex? And she kept talking about it, trying to force [him]." Def. App. 159. Tanner said H.P. got on top of him and started kissing him, took off her pants, and had sex with him, even though he told her to stop. He said that after she stopped, he went to the bathroom to put his clothes on, and he and his friends left. He could not say whether they used a condom. Tanner said he had lied at first because he was scared he would get in trouble (he could not explain how he would "get in trouble for being forced to have sex with somebody"). Def. App. 155. Tanner said that he had had sex one time before that night, a long time ago.

The deputies left the room several times during the interview. During one of those occasions, they called Amy Zeman, whose son hosted the bonfire on Saturday night that Tanner had attended. Def. SOF ¶ 16J; Pl. SOF ¶ 16. She confirmed that she had asked Tanner to leave because she thought "he was drinking and/or possibly doing drugs." *Id.* Prior to Tanner admitting to going to H.P.'s house on Saturday night, Tanner twice denied being asked to leave the bonfire (once with the deputies present and once to his

parents when the deputies had left the room). Def. App. 118, 138, 145-46. After Tanner admitted to going to H.P.'s house, Tanner continued to deny being asked to leave the bonfire, drinking, or using drugs on Saturday night. Def. App. 155-56.

The deputies indicated that they were going to arrest Tanner. Def. App. 166. Tanner's mother, Candi, asked what would happen if the deputies discovered later that the encounter was consensual. Def. App. 166-67. Tanner asked why he was being arrested if he "got forced into it." Def. App. 167. The deputies said that they did not believe him, they believed H.P. Def. App. 168. Tanner responded, "Of course. Always believe the girl." Def. App. 168. Deputy Quandt said that they spent the morning with H.P. being interviewed by Child Protection Services, and Tanner and his mother requested the same interview for him, which was denied. The deputies also indicated that they had decided to arrest Tanner prior to his statement. Candi was upset that Tanner was being arrested and asked that the deputies investigate why rumors were going around about Tanner and H.P. having consensual sex. Candi indicated that she had heard about the rumors from Tanner's girlfriend. Candi also gave the deputies the names of two of H.P.'s friends (one of whom was the same girl that Angela had told the officers H.P. texted with on Tuesday), stating that H.P. bragged to those girls about having sex with Tanner at the beginning of the week. Tanner also gave the names of three other boys who might have heard H.P. bragging or that H.P. "had tried to do the same thing to." Def. App. 182-84.

The deputies arrested Tanner for three counts of sexual abuse in the third degree. Def. SOF ¶¶ 17-23; Pl. Resp. SOF ¶¶ 17-23. On October 3, 2016, the prosecuting attorney filed a formal petition charging Tanner with those counts. *Id.* The deputies continued their investigation through the month of October 2016. They obtained sworn written statements from the three counselors H.P. talked to at school on Monday prior to telling her mother what happened. Def. App. 199-201. The resource-room teacher, who H.P. had talked to first on Monday, stated that H.P. told her she had sex with Tanner and that "it wasn't suppose[d] to happen, it just did." Def. App. 199. She indicated

H.P. said that Tanner's girlfriend had found out and was upset. *Id.* The resource-room teacher believed H.P. was most concerned with telling her mother and wanted the teacher's opinion on what H.P. should do. *Id.* H.P. also talked to her guidance counselor on Monday, whose statement indicated H.P. told her she had a dream about Tanner and told her friends at work about it, and now they were spreading it around. Def. App. 201. Later that day, the guidance counselor said she received an email from H.P. saying "it wasn't a dream, it really happened," but the counselor indicated "she hadn't given any details so I wasn't sure what she meant." *Id.* Later on Monday, H.P. talked to a different guidance counselor when her guidance counselor was unavailable. Def. App. 200. His statement indicates H.P. came to his office concerned about a text message and about telling her mom something. Def. App. 200. H.P. showed him the text message from Tanner's girlfriend (which mentioned sex between H.P. and Tanner), and he asked if that was what she was afraid to talk to her mother about. *Id.* H.P. said yes, and he advised her to have a one-on-one conversation with her mom. *Id.* His statement indicated he advised her to email her guidance counselor, since "they had worked together that morning on whatever was going on." *Id.*

The deputies also conducted interviews of one of the boys who was at H.P.'s house with Tanner and two friends of H.P's who she had talked to about what happened (including H.P.'s coworker). Def. SOF ¶ 25; Pl. Resp. SOF ¶ 25; Def. App. 196-97. During his interview with Deputy Quandt, Tanner's friend said that he met up with Tanner around 10:00 p.m. on Saturday night, and they went to the bonfire. Def. App. 196. He said that H.P. called him around 3:00 a.m. early Sunday morning via MSN messenger and asked the boys to come over to her house, sending him a message with her address. *Id.* He told Deputy Quandt that he had already deleted the message, so he could not show it to him. *Id.* He said that they watched television in the basement, and H.P. was "all over Tanner." *Id.* He said H.P. went into her room and called for Tanner to join her. *Id.* He said he peeked into the bedroom once and saw Tanner "on top" of

H.P. *Id.* He estimated they were at the house for about two hours, and he fell asleep. *Id.* He denied that Tanner did any drinking that night. *Id.*

Deputies Randall and Quandt also interviewed H.P.'s friend who she had worked with on Sunday and talked with (leading to the rumors around school). *Id.* She said that H.P. had told her that the boys had come over Saturday night and that H.P. had had sex with Tanner. *Id.* She said H.P. bragged about getting together with Tanner to her and other people at work and seemed happy about it. *Id.* She said H.P. never mentioned anything to suggest it was rape. *Id.* She also mentioned the name of another friend of H.P.'s, who she said H.P. told the encounter was consensual. Def. App. 196-97.

Deputy Quandt interviewed the friend mentioned by H.P.'s coworker. Def. App. 197. She said her understanding from H.P. was that H.P. was texting Tanner on Saturday night, and Tanner wanted to hang out with her, but H.P.'s parents were not home. *Id.* Tanner showed up at H.P.'s house, and H.P. told him he could not be there because her parents were not home. *Id.* H.P. and the boys watched television for a while, and then Tanner went into H.P.'s room. *Id.* H.P. followed him to see what he was doing. *Id.* Tanner would not leave her room. *Id.* H.P. and Tanner sat in her room for a long time, and they ended up having sex. *Id.* H.P. told her friend that she said "no" several times, but they ended up having sex anyway. *Id.*

The deputies also obtained a written statement from Amy Zeman, the mother of the host of the bonfire Saturday night. Def. App. 202. In her statement, she indicated that Tanner drank a beer at the bonfire, and although she told him she did not allow drinking, she did not say that she asked him to leave. *Id.* Later, she learned that Tanner was smoking in the car (she did not know whether he was smoking cigarettes or marijuana), and when she asked his friend to tell him that smoking marijuana was not permitted at her house, Tanner and his friends decided to leave. Def. App. 202-03. Amy Zeman's statement does not indicate that she asked Tanner to leave the bonfire. *Id.*

On June 21, 2017, Tanner filed a motion to suppress the statements he made during his interview with Deputies Randall and Quandt from being used as evidence against him

in the criminal case, arguing that he had not validly waived his *Miranda* rights prior to talking to the officers. Def. SOF ¶¶ 19-23; Pl. Resp. SOF ¶¶ 19-23. The court granted the motion to suppress on July 10, 2017, and the prosecutor dismissed the charges against Tanner on July 25, 2017. *Id.*

Tanner and his parents initiated this lawsuit in June 2018. Doc. 1. Their second amended complaint alleges five counts against all Defendants: (1) a § 1983 claim for arrest without probable cause and for a violation of Tanner's substantive due process rights based on reckless investigation; (2) a common law false-arrest claim; (3) a common law malicious-prosecution claim; (4) a common law claim for loss of consortium (based on Defendants' negligence); and (5) a common law claim for negligence and gross negligence. Doc. 35. The parties consented to the exercise of jurisdiction by a United States magistrate judge, and the case was assigned to me for final disposition. Docs. 17, 57.

## II.    DISCUSSION

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant [a motion for] summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." For the plaintiff to avoid summary judgment, sufficient evidence must exist "on which the jury could reasonably find for the plaintiff.'" *Olmsted v. Saint Paul Pub. Sch.*, 830 F.3d 824, 828 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). The court "view[s] the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Soo Line R.R. Co. v. WernerEnters.*, 825 F.3d 413, 418 (8th Cir. 2016) (quoting *Bishop v. Glazier*, 723 F.3d 957, 960-61 (8th Cir. 2013)).

Defendants move for summary judgment on all claims. Docs. 37, 41. Plaintiffs filed a resistance. Doc. 46. Plaintiffs agree that to the extent they raised a § 1983 claim based on a violation of Tanner's *Miranda* rights, Defendants are entitled to summary

judgment on that claim. Doc. 46-2 at 23. Plaintiffs also agree that Defendant Kucera is entitled to summary judgment for the claims against him in his individual capacity. *Id.* at 24.

Plaintiffs suggest that "Defendants['] summary judgment argument concerning a 'reckless investigation' under the Fourteenth Amendment and false arrest under Iowa [law] are somewhat premature." Doc. 46-2 at 42. Plaintiffs cite to the court's prior order limiting discovery. *Id.*; *see* Doc. 32. Plaintiffs misunderstand the court's prior discovery order. Plaintiffs go on to address the merits of their reckless-investigation and false-arrest claims, but they do not respond to Defendants' arguments regarding their state-law malicious-prosecution and negligence claims. As will be illustrated by my discussion of the elements of each of Plaintiffs' claims, I find that Plaintiffs have engaged in sufficient discovery for Defendants' summary-judgment motion to be ruled upon at this time.

### A. Section 1983

Section 1983 creates a cause of action against state actors who violate a person's constitutional rights. **42 U.S.C. § 1983**. "A government official is entitled to qualified immunity on a § 1983 claim unless (1) 'the facts shown by the plaintiff make out a violation of a constitutional or statutory right,' and (2) the 'right was clearly established at the time of the defendant's alleged misconduct.'" **Thompson v. Dill**, 930 F.3d 1008, 1012 (8th Cir. 2019) (quoting **Morgan v. Cook**, 686 F.3d 494, 496 (8th Cir. 2012)). "Qualified immunity doctrine 'permit[s] the resolution of many insubstantial claims on summary judgment' and 'avoid[s] "subjecting government officials either to the costs of trial or to the burdens of broad-reaching discovery" in cases where the legal norms the officials are alleged to have violated were not clearly established at the time.'" **Mogard v. City of Milbank**, 932 F.3d 1184, 1188 (8th Cir. 2019) (alterations in original) (quoting **Mitchell v. Forsyth**, 472 U.S. 511, 526 (1985)).

Here, Plaintiffs allege that Deputies Quandt and Randall violated Tanner's Fourth Amendment right to be free from arrest without probable cause by failing to conduct a reasonably thorough investigation. They also allege that Deputies Quandt and Randall's reckless investigation violated Tanner's constitutional rights under the Due Process Clause.

### 1. *Fourth Amendment*

The Fourth Amendment protects the "right of citizens not to be arrested without probable cause." *Kuehl v. Burtis*, 173 F.3d 646, 649 (8th Cir. 1999). Officers are entitled to qualified immunity on a false arrest claim if the "arrest was supported by at least *arguable* probable cause." *Johnson v. McCarver*, 942 F.3d 405, 409 (8th Cir. 2019); *see also Kuehl*, 173 F.3d at 649-50. "Arguable probable cause exists if it turns out that an officer lacked adequate grounds for an arrest, but made an objectively reasonable mistake about the existence of probable cause." *Johnson*, 942 F.3d at 409. "Probable cause exists when the totality of circumstances demonstrates that a prudent person would believe that the arrestee has committed or was committing a crime." *Kuehl*, 173 F.3d at 650.

> [B]ecause the *totality* of circumstances determines the existence of probable cause, evidence that tends to negate the possibility that a suspect has committed a crime is relevant to whether the officer has probable cause. An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists. . . .
>
> [R]elatedly, law enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances and so long as "law enforcement would not be unduly hampered if the agents wait to obtain more facts before seeking to arrest." *See United States v. Woolbright,* 831 F.2d 1390, 1394 (8th Cir.1987). An officer need not conduct a "mini-trial" before making an arrest, but probable cause does not exist when a "minimal further investigation" would have exonerated the suspect.

*Kuehl*, 173 F.3d at 650-51 (cleaned up) (bold emphasis added) (citations omitted); *see also **Duhe v. City of Little Rock***, 902 F.3d 858, 863 (8th Cir. 2018), *cert. denied*, 139 S. Ct. 1178 (2019). "When deciding whether to arrest a subject, '[o]fficers may "rely on the veracity of information supplied by the victim of a crime."'" ***Gilmore v. City of Minneapolis***, 837 F.3d 827, 832 (8th Cir. 2016) (quoting ***Borgman v. Kedley***, 646 F.3d 518, 523 (8th Cir. 2011)). "Probable cause is a question of law that is determined at the moment the arrest is made, and 'any later developed facts are irrelevant to the probable cause analysis.'" ***Hosea v. City of St. Paul***, 867 F.3d 949, 955 (8th Cir. 2017) (quoting *Gilmore*, 837 F.3d at 833).

Under Iowa law, "[a] person commits sexual abuse in the third degree when the person performs a sex act . . . by force or against the will of the other person . . . ." **Iowa Code § 709.4(1)(a).** "Sex act" is defined to include "[p]enetration of the penis into the vagina"; "[c]ontact between the mouth and genitalia"; and "[c]ontact between the finger or hand of one person and the genitalia or anus of another person." **Iowa Code § 702.17**. Iowa courts have upheld the sufficiency of evidence supporting a conviction for sexual abuse in the third degree when the victim did not "physically fight off [defendant's] advances" but repeatedly told the defendant no and asked him to leave, ***State v. Cousins***, No. 98-1855, 2000 WL 204060, at *1-2 (Iowa Ct. App. Feb. 23, 2000), and when the sexual encounter was initially consensual, but the victim later changed her mind, *see **State v. Plaster***, 424 N.W.2d 226, 227, 233 (Iowa 1988) (holding that sufficient evidence "support[ed] the jury's determination that the sexual intercourse in question was with force or against the will of the victim" when the defendant and victim met, went to a bar, and went home together; the victim engaged in consensual oral sex with the defendant; the defendant "put his fingers into [the victim's] vagina" in a manner that caused her pain, and the victim told him to stop; later, the defendant sought to engage the victim in sexual intercourse, and when she refused, he threatened to "'use his hand again' if she did not agree"; the victim testified she "went along with what he wanted" because she was afraid the defendant would hurt her, and she "just laid there

kind of crying"; and the victim stayed at the defendant's apartment for several hours afterward and gave the defendant her telephone number before leaving).

Plaintiffs argue that Deputies Quandt and Randall lacked probable cause to arrest Tanner for sexual abuse in the third degree because they ignored plainly exculpatory evidence. They argue that H.P.'s Child Protection Services interview supports that the encounter was consensual because H.P. brought up sex first by mentioning a condom, Tanner offered to get a condom, and H.P. told him not to bother. First, in context, H.P.'s statement telling Tanner not to bother getting a condom supports that she told him she did not want to have sex with him:

> I told him that even if I would want to do anything, he doesn't have a condom, so I wouldn't do anything with him. And he's like, Well, go get one. I was like, No, because I don't want to do anything. I just told you that . . . even if you did, I wouldn't want to do anything.

Def. App. 85. Second, whether H.P. brought up sex first or not does not support that the encounter was consensual. H.P. said throughout the interview that she repeatedly told Tanner she did not want to have sex, and he continued to try to have sex with her anyway. H.P.'s Child Protection Services interview is not exculpatory evidence.

Plaintiffs also argue that inconsistencies regarding whether H.P. invited Tanner over to the house calls H.P.'s statements in her interview into question. Angela initially told the deputies when she talked to them in the restaurant parking lot on Monday that H.P. had invited the boys over to the house, but on Tuesday, Angela said that the boys had been the first ones to contact H.P. At her interview, H.P. said that the boys had contacted her first. Tanner said the opposite. The deputies could believe H.P.'s version of events over Tanner's. That Angela initially said H.P. invited the boys over does not mean that H.P. changed her story—Angela was upset, and she had not talked in-depth to H.P. about what happened. Moreover, even if H.P. had invited the boys over, the inconsistency does not necessitate disbelief about what H.P. said happened with Tanner in her bedroom.

Plaintiffs also argue the deputies ignored the exculpatory evidence that H.P. told her counselors at school and her friend at work the encounter was consensual. At the time of Tanner's arrest, the deputies had not yet talked to H.P.'s counselors or her friend at work. They knew what Angela had told them—that H.P. had told one of her teachers that the encounter was consensual and that H.P. had described the encounter in terms of a dream or a hypothetical to the guidance counselors. The deputies also had H.P.'s explanation that she did not go into detail about what happened with her teachers and that her teachers did not understand "what [she] was getting at, that it wasn't something that [she] wanted to do." The officers also knew that a rumor was going around H.P.'s school about H.P. and Tanner having (consensual) sex, but H.P. posited in her interview that the rumor started because someone overheard her talking to her friend at work, who H.P. said she told everything (and who advised her to tell her mother about what happened). It was not clear at that time that H.P. had neglected to tell her coworker that she repeatedly told Tanner no. At the time of Tanner's arrest, the officers had a reasonable explanation from H.P. about why she had not told her teachers she had not wanted to have sex with Tanner. They also had a reasonable explanation from H.P. about how the consensual-sex rumor had started.

Plaintiffs also argue that the deputies ignored the exculpatory evidence from H.P.'s examination at the hospital, which revealed no signs of force or trauma. The results of the examination were consistent with H.P.'s story. H.P. said that she repeatedly told Tanner "no" and that she did not want to have sex, but she did not say that Tanner used brute force to rape her. Iowa caselaw (and, I would argue, common sentiment) is clear that "no means no"—force is not required. *See State v. Meyers*, 799 N.W.2d 132, 146 (Iowa 2011) ("[S]ection 709.4(1) does not require evidence of both force and lack of consent, but one or the other."). That Tanner had sex with H.P. after she repeatedly told him she did not want to have sex with him is sufficient to establish sexual abuse in the third degree under Iowa law, even if H.P. did not physically resist Tanner.

Plaintiffs argue that minimal further investigation by the deputies would have exonerated Tanner. They argue that prior to Tanner's arrest, the deputies should have talked to the two boys who were at H.P.'s house with Tanner (and gathered evidence of the communications sent by H.P. that night), the teachers H.P. talked to Monday at school, and the friends H.P. talked to about what happened.

Plaintiffs rely on *Kuehl*, 173 F.3d 646. In that case, officers were investigating an altercation between a store owner and a customer. *Id.* at 648. Officers talked to the victim, three of his friends, an employee of the plaintiff's, and two other shoppers in the store, who all "stated that [the plaintiff] struck [the victim] on the face." *Id.* The officers observed some "very slight bruising" on the victim's face. *Id.* But the officers ignored the following exculpatory evidence: the plaintiff's employee tried to retract her statement; and during the twenty seconds the officers deigned to talk to the plaintiff, she stated she acted in self-defense after the victim hit her, which was corroborated by the "pronounced bruising" on her face. *Id.* at 648, 651. Another employee of the plaintiff's tried to explain what happened—she was the only witness who saw the entire altercation— but officers refused to talk to her. *Id.* The Eighth Circuit held that the officers lacked arguable probable cause to arrest the plaintiff for assault because they ignored exculpatory evidence, and "a more thorough investigation" (talking to the plaintiff and the employee who witnessed everything) would have "further exonerated [the plaintiff] and negated probable cause" and "would not have unduly hampered the process of law enforcement," as three officers were on the scene with the witnesses. *Id.* at 651.

*Kuehl* is distinguishable. In *Kuehl*, unlike here, the officers were on the scene with potential witnesses, making the failure to interview them inexcusable. *See id.* at 651. Indeed, in holding that officers need not conduct a "'mini-trial' before making an arrest" but should conduct "minimal further investigation," the court cited cases holding that officers should interview witnesses readily available on the scene, but that they are not required to track down and interview alibi witnesses prior to arrest. *Id.* at 650-51.

Moreover, there was no ignored evidence here similar to the exculpatory evidence at issue in *Kuehl* (the plaintiff's story and corroborating bruised face).

The Eighth Circuit has distinguished *Kuehl* on several occasions since its issuance. In *Amrine v. Brooks*, 522 F.3d 823, 826-27, 832 (8th Cir. 2008), the court held that the officers had arguable probable cause to arrest the plaintiff for a murder committed in a prison recreation room when the victim had been spreading rumors about the plaintiff, providing motive; a "confidential source" indicated the plaintiff had threatened to attack the victim earlier in the day; an inmate (who had gotten into a fight with the victim earlier in the week) stated the plaintiff had told him he committed the murder; and officers found blood stains on the plaintiff's clothing (that appeared old), and no one else's. The court held that the officers had arguable probable cause even though a prison guard said that a different inmate (who looked similar to the plaintiff) had been chasing after the victim just prior to the attack (the same inmate that had gotten into a fight with the victim a few days previously and named the plaintiff as the killer). *Id.* at 832. The court held that it would have taken more than a "minimal further investigation to sort out the inconsistencies surrounding [the other inmate's] location at the time of the murder" (the other inmate claimed he had left the recreation room to talk to two different guards, who the officers did not interview prior to the plaintiff's arrest), "to ascertain the source of the blood spots on [plaintiff's] clothing, and to interview additional witnesses who might have exculpated [plaintiff]." *Id.* at 833.

In *Clayborn v. Struebing*, 734 F.3d 807, 809-10 (8th Cir. 2013), the Eighth Circuit held that the officers had arguable probable cause to arrest the plaintiff for using a counterfeit $100 bill at a mall food court when two mall employees identified the plaintiff as using the bill; the plaintiff made inconsistent statements about how she had paid for her food, first stating that she had used a $20 bill and later stating that she had used a $10 bill and three $1 bills; and the plaintiff claimed to have thrown her receipt away, which the officers dug through the trash and found, but mall employees stated that receipt belonged to a different person who ordered thirty minutes after plaintiff. The court

recognized that the officers could have investigated further by viewing mall surveillance footage, discussing the incident with mall security, searching the plaintiff's wallet, or making a timeline of the plaintiff's activity, but held that "[t]he officers had no duty to conduct further investigation once they had (arguable) probable cause to arrest," noting that "[t]he officers' suspicion . . . would not have been dispelled by briefly questioning anyone at the scene." ***Id.*** at 809-10.

Here, even if the deputies had talked to additional witnesses prior to arresting Tanner, at the end of the day, only two people were in the bedroom where the alleged rape occurred: Tanner and H.P. Probable cause would not have dissipated even if the deputies had interviewed the two boys at the house that night or H.P.'s teachers and friends that H.P. talked to about the incident—although their statements might have called some of what H.P. said into question, the deputies could still credit H.P.'s detailed statement over Tanner's statement in which he first claimed he had never been present at the house and later claimed H.P. had been the one to force herself on him. This fact is illustrated by the evidence the deputies gathered after Tanner's arrest, which does not exculpate Tanner. *See **Gibson v. Cook***, 764 F.3d 810, 813-14 (8th Cir. 2014) (analyzing evidence gathered after arrest to determine whether it would have negated probable cause). Although one of H.P.'s friends described H.P. as bragging about having sex with Tanner, another of H.P.'s friends indicated H.P. had relayed (as she had to the Child Protection Services interviewer) that she said "no" several times but ended up having sex with Tanner anyway. The statements from H.P.'s counselors at school explain how they believed the encounter was consensual at first, even if it was not: H.P. did not provide many details, and she also stated that sex with Tanner "wasn't supposed to happen, it just did" (which in retrospect, is consistent with H.P.'s statement she told Tanner she did not want to have sex, but he had sex with her anyway). Tanner's friend's statement corroborated Tanner's version of events that H.P. invited them over to the house, but ultimately, whether H.P. invited the boys over or they invited themselves is irrelevant to whether H.P. was raped. The same goes for the friend's statement that H.P.

was "all over" Tanner on the couch—which I also note is inconsistent with H.P.'s and Tanner's stories, who both suggested nothing happened between the pair until Tanner went into H.P.'s bedroom. And Tanner's friend said that he saw Tanner on top of H.P. in the bedroom, which is consistent with what H.P. said happened, not Tanner.

The deputies had arguable probable cause to arrest Tanner for sexual abuse in the third degree based on H.P.'s statement that she told Tanner multiple times that she did not want to have sex with him. The deputies could credit H.P.'s detailed version of events over Tanner's inconsistent statement in which he first denied being at H.P.'s house, and later admitted being at the house but stated generally that H.P. forced herself on him. The deputies did not avoid plainly exculpatory evidence, and minimal further investigation would not have exonerated Tanner—indeed, it appears under Iowa law that the evidence could have been sufficient to convict Tanner at trial, but the case was dismissed due to Tanner's statements being suppressed for a *Miranda* violation.[8]

Deputies Quandt and Randall are entitled to qualified immunity on Plaintiffs' § 1983 claim premised on a violation of the Fourth Amendment.

### 2. *Substantive Due Process*

"To establish a substantive due process violation, [a plaintiff] must demonstrate that a fundamental right was violated and that the conduct shocks the conscience." *Akins v. Epperly*, 588 F.3d 1178, 1183 (8th Cir. 2009) (footnote omitted). The fundamental right involved in the case of a "failure to investigate is 'the interest in obtaining fair criminal proceedings before being denied one's liberty in the most traditional sense.'" *Id.* at 1183 n.2 (quoting *Wilson v. Lawrence Cnty.*, 260 F.3d 946, 956 n.8 (8th

---

[8] Plaintiffs argue that because Deputies Randall and Quandt determined they had probable cause to arrest Tanner before interviewing Tanner, Tanner's statement should be ignored in determining whether probable cause existed. They cite to no caselaw to support this proposition. In any event, I agree with Defendants that H.P.'s statement was sufficient, standing alone, to provide probable cause to arrest Tanner and that Tanner's inconsistent statement merely bolstered the existence of probable cause.

Cir. 2001)). "To establish a violation of due process based on a failure to investigate, [the plaintiff] must show that [the state actors] 'intentionally or recklessly failed to investigate, thereby shocking the conscience.'" *Id.* at 1184 (quoting *Amrine*, 522 F.3d at 834).

> [The Eighth Circuit] ha[s] held that the following circumstances indicate reckless or intentional failure to investigate that shocks the conscience: (1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, [and] (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence. An officer's negligent failure to investigate inconsistencies or other leads is insufficient to establish conscience-shocking misconduct.

*Id.* (citations omitted).

Plaintiffs make the same arguments to support their substantive due process claim as they did to support their Fourth Amendment claim. For the reasons stated in the preceding section, there is insufficient evidence for a jury to find that Deputies Quandt and Randall intentionally or recklessly failed to investigate. The deputies are entitled to qualified immunity on Plaintiffs' § 1983 claim premised on a violation of Tanner's substantive due process rights.

### 3. Municipal Liability

The parties previously agreed that "for municipal liability to attach, individual liability first must be found on an underlying substantive claim" (Doc. 32 at 2). *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005). Because I have found Plaintiffs failed to establish that Deputies Randall and Quandt violated Tanner's constitutional rights, Tama County is entitled to summary judgment on Plaintiffs' § 1983 claims.

### B. State-Law Claims

Defendants also move for summary judgment on Plaintiffs' claims of false arrest, malicious prosecution, and negligence under Iowa state law.

### 1.  False Arrest

Under Iowa law, "the essential elements of the tort of false arrest are (1) detention or restraint against one's will and (2) unlawfulness of the detention or restraint." *Children v. Burton*, 331 N.W.2d 673, 678-79 (Iowa 1983).  An arrest is not unlawful if the officer "acts with probable cause, . . . even though the person arrested turns out to be innocent." *Id.* at 679.  "A false arrest case involving the issue of probable cause turns on what the officer knew at the time of arrest, not what he learned later." *Id.* at 678.

Plaintiffs recognize that the standard under Iowa law for a false arrest claim is very similar to (if not identical to) a § 1983 claim for arrest without probable cause. *See* Doc. 46-2 at 42-47.  They generally make the same arguments as they did in support of their § 1983 claim to argue that Deputies Randall and Quandt lacked probable cause to arrest Tanner under Iowa law.  For the same reason I rejected Plaintiffs' arguments in connection with their § 1983 claim, I find that the facts viewed in the light most favorably to Plaintiffs fail to establish that Deputies Quandt and Randall lacked probable cause to arrest Tanner for sexual abuse in the third degree.  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' false arrest claim.


### 2.  Malicious Prosecution

Under Iowa law, malicious prosecution requires proof of the following:  "(1) a previous prosecution, (2) instigation of that prosecution by the defendant, (3) termination of that prosecution by acquittal or discharge of the plaintiff, (4) want of probable cause, (5) malice on the part of [the] defendant for bringing the prosecution, and (6) damage to [the] plaintiff." *Linn v. Montgomery*, 903 N.W.2d 337, 345 (Iowa 2017) (alterations in original) (quoting *Wilson v. Hayes*, 464 N.W.2d 250, 259 (Iowa 1999)).  As discussed in the preceding sections, probable cause existed to prosecute Tanner for sexual abuse in the third degree.  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' malicious prosecution claim.

### *3. Negligence*

Defendants argue that under Iowa law, a negligence claim cannot be premised on "negligent investigation of crime by law enforcement officers," citing the Iowa Supreme Court's holding in *Smith v. State*, 324 N.W.2d 299, 300 (Iowa 1982). Plaintiffs do not respond to Defendants' argument. Plaintiffs do not have a cognizable negligence claim under Iowa law, and Defendants are entitled to summary-judgment on Plaintiffs' negligence and loss-of-consortium claims. *See **Oppedahl v. Navistar, Inc.**,* No. 4:14-CV-00475-SMR-CFB, 2015 WL 12866992, at *8 (S.D. Iowa June 9, 2015) (noting that under Iowa law, "loss of consortium claims will be dismissed if the injured party cannot recover from the defendant on the underlying claims").

### III.   CONCLUSION

Defendants' motion for summary judgment (Doc. 37) is **granted**. Judgment should be entered in favor of all Defendants.

**IT IS SO ORDERED** this 27th day of December, 2019.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa